UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEAN ANDERSEN, Derivatively on Behalf of Nominal Defendant CITIGROUP INC.<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL CORBAT, ELLEN M. COSTELLO, GRACE E. DAILEY, BARBARA DESOER, JOHN C. DUGAN, JANE FRASER, DUNCAN P. HENNES, PETER BLAIR HENRY, S. LESLIE IRELAND, LEW JACOBS, RENEE J. JAMES, GARY M. REINER, DIANA L. TAYLOR, JAMES S. TURLEY, DEBORAH C. WRIGHT, ALEXANDER WYNAENDTS, and ERNESTO ZEDILLO,<br><br>Defendants,<br><br>and<br><br>CITIGROUP INC.,<br><br>Nominal Defendant. | Case No.: |

Plaintiff Dean Andersen ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Citigroup Inc. ("Citigroup" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by his counsel, including a review of publicly available information, such as filings by Citigroup with the U.S. Securities and Exchange

Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Citigroup is one of the largest financial institutions in the world, the third largest financial institution in the United States, and is considered systemically important.  It has operations in approximately 100 countries and provides a full set of financial products.  The Company's major business segments are commercial banking, consumer financial services, and broker-dealer and investment banking activities.  These businesses are conducted through a variety of legal entities, including national banks and their subsidiaries.  In particular, Citigroup operates Citibank, N.A. ("Citibank"), a wholly owned subsidiary, as its global branch brand.

2.      Citigroup's operations are subject to government regulation in the United States and abroad.  In the United States, government regulators of Citigroup and its Citibank operations include the U.S. Department of the Treasury Office of the Comptroller of the Currency ("OCC"), the Board of Governors of the Federal Reserve System (the "Federal Reserve"), the Commodities and Futures Trading Commission ("CFTC"), and the Department of Justice ("DOJ").

3.      In its public filings, Citigroup acknowledges that it is a "highly regulated financial services company."  As a result of the financial services regulatory environment in the United States and the Company's diverse operations, Citigroup is subject to dozens of laws and regulations.  Citigroup's Board is well aware of the regulatory requirements on the Company and place heavy emphasis in the Company's proxy statements on the Company's processes for legal and regulatory compliance and risk management.

4.      Since approximately 2012, federal regulators have executed more than fifteen enforcement actions against Citigroup and Citibank, all expressly arising from deficient internal

controls.   In order to settle these regulatory actions, Citigroup's Board repeatedly agreed to remediate the Company's internal control deficiencies and to pay significant monetary penalties. The internal control remediations agreed to by the Board consisted of detailed plans on fixed schedules, and the Board represented it would exercise continuing oversight over the problems.

5.     The cost to the Company from the financial penalties in these settlements is enormous: since 2014, Citigroup paid over $2.6 billion dollars in regulatory fines and penalties.

6.     Unbeknownst to investors, the Board was not complying with the terms of its settlement agreements with federal regulators.   In several instances, years after entry of a consent order, the deficient internal controls remained deficient while the Board extolled its supposedly robust regulatory compliance programs in proxy solicitations.

7.     The Board's pervasive failure to comply with the terms of the regulatory settlements was unknown to investors until August 2020.   In early August 2020, the Company accidentally wired $900 million to lenders who it intended to pay a fraction of that amount.   In the days and weeks following Citigroup's $900 million mistake, articles in the media revealed that federal regulators saw the error as more than an embarrassment: it was evidence of Citigroup's complete inability to institute the internal controls necessary to operate in a safe and legal manner.

8.     As the market came to understand the scale of the problem, Citigroup's stock fell approximately 20% over the course of less than two weeks.   Following the stock drop, the Company announced that its Chief Executive Officer ("CEO"), defendant Corbat (defined herein), would step down in 2021, years earlier than anticipated.

9.     On October 7, 2020, the Federal Reserve and the OCC each announced new enforcement actions against the Company and a $400 million penalty.   The regulators found that Citigroup had not complied with the terms of consent agreements it entered with them in 2013 and

2015, despite express promises from the Board to institute comprehensive internal control remediation.

10.     Citigroup has now been severely damaged.  Reflecting as much, during the third quarter earnings call held on October 13, 2020, analysts asked management "why isn't Citigroup the new Wells Fargo, in terms of regulatory issues?"  The Company has incurred over $2.6 billion in regulatory penalties in the last five years alone and the credibility of management is now in serious doubt.

11.     Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board.  The Board is currently composed of seventeen members, all of whom are named in this action.  As alleged herein, three members of the Board are not disinterested outside directors.  An additional majority of the Board presided over the wrongdoing alleged herein by expressly committing to institute internal control remediations which it did not, and thus faces a substantial likelihood of liability.  More than half of the current Board members would be interested in a demand to investigate their own wrongdoing.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act the Exchange Act.

13.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a)(l) because complete diversity exists between Plaintiff and each Defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs.  This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper in this District because Citigroup is headquartered in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendant has received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.     PARTIES

### A.     Plaintiff

16.     Plaintiff Dean Andersen is a current shareholder of Citigroup.  Plaintiff has continuously held Citigroup stock since 2008.  Plaintiff is a resident of Georgia.

### B.     Nominal Defendant

17.     Citigroup is a Delaware corporation with its principal executive offices at 388 Greenwich Street, New York, New York 10013.  Citigroup's shares trade on the NYSE under the ticker symbol "C."

### C.     Defendants

18.     Defendant Michael Corbat ("Corbat") has served as Citigroup's CEO and a director since 2012.  Corbat is a resident of New York.

19.     Defendant Ellen M. Costello ("Costello") has served as a director of Citigroup since 2016 and as a director of Citibank since 2016.  Costello is a member of the Audit Committee and the Risk Management Committee.  Costello is a resident of  Illinois.

20.     Defendant Grace E. Dailey ("Dailey") has served as a director of Citigroup since 2019.  Daily is a member of the Audit Committee and the Risk Management Committee.  Dailey is a resident of Minnesota.

21.     Defendant Barbara Desoer ("Desoer") has served as a director of Citigroup since 2019 and as a director of Citibank since 2014.  Desoer has been employed by Citigroup since 2013 as Chief Operating Officer of Citibank until 2013, and as Citibank's CEO until April 2019.  Desoer is a member of the Risk Management Committee.  Desoer is a resident of California.

22.     Defendant John C. Dugan ("Dugan") has served as a director of Citigroup since 2017 and Chair of the Board since 2019.  Dugan is a member of the Audit Committee, the Nomination, Governance and Public Affairs Committee, the Personnel and Compensation Committee, and the Risk Management Committee.  Dugan is a resident of New York

23.     Defendant Jane Fraser ("Fraser") became a director of Citigroup on September 10, 2020.  Fraser currently serves as the President of Citigroup and the CEO of Global Consumer Banking and has been employed by Citigroup in various capacities continuously since 2004.  In September 2020, the Company announced that Fraser would succeed defendant Corbat as CEO of Citigroup in 2021.  Fraser is a resident of Florida.

24.     Defendant Duncan P. Hennes ("Hennes") has served as a director of Citigroup since 2013 and as a director of Citibank since 2013.  Hennes is a member of the Audit Committee, the Chair of the Personnel and Compensation Committee, and a member of the Risk Management Committee.  Hennes is a resident of New York

25.     Defendant Peter Blair Henry ("Henry") has served as a director of Citigroup since 2015.  Henry is a member of the Audit Committee, the Chair of the Ethics, Conduct and Culture Committee, and the Nomination, Governance and Public Affairs Committee.  Henry is a resident of New York.

26.    Defendant S. Leslie Ireland ("Ireland") has served as a director of Citigroup since 2017 and as a director of Citibank since 2017.  Ireland is a member of the Operations and Technology Committee.  Ireland is a resident of Virginia.

27.    Defendant Lew Jacobs ("Jacobs") has served as a director of Citigroup since 2018. Jacobs is a member of the Audit Committee, the Ethics, Conduct and Culture Committee, the Nomination, Governance and Public Affairs Committee, and the Personnel and Compensation Committee.  Jacobs is a resident of California.

28.    Defendant Renee J. James ("James") has served as a director of Citigroup since 2016.  James is a member of the Operations and Technology Committee and the Risk Management Committee.  James is a resident of Oregon.

29.    Defendant Gary M. Reiner ("Reiner") has served as a director of Citigroup since 2013.  Reiner is the Chair of the  Operations and Technology Committee and a member of the Personnel and Compensation Committee.  Reiner is a resident of Connecticut.

30.    Defendant Diana L. Taylor ("Taylor") has served as a director of Citigroup since 2009.  Taylor is the Chair of the Nomination Governance and Public Affairs Committee and is a member of the Personnel and Compensation Committee.  Taylor is a resident of New York.

31.    Defendant James S. Turley ("Turley") has served as a director of Citigroup since 2013 and as a director of Citibank since 2013.  Turley is the Chair of the Audit Committee and a member of the Risk Management Committee.  Turley is a resident of Missouri.

32.    Defendant Deborah C. Wright ("Wright") has served as a director of Citigroup since 2017 and as a director of Citibank since 2019.  Wright is a member of the Audit Committee, and the Ethics, Conduct and Culture Committee.  Wright is a resident of New York.

33.     Defendant Alexander Wynaendts ("Wynaendts") has served as director of Citigroup since 2019.  Wynaendts is a member of the Risk Management Committee.  Wynaendts is a resident of the Netherlands.

34.     Defendant Ernesto Zedillo ("Zedillo") has served as director of Citigroup since 2010.  Zedillo is a member of the Ethics, Conduct and Culture Committee, the Nomination, Governance and Public Affairs Committee, and the Risk Management Committee.  Zedillo is a resident of Connecticut.

35.     The defendants named in ¶¶ 16-31 are sometimes referred to hereinafter as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.     Fiduciary Duties Under Delaware Law

36.     By reason of their positions as officers, directors, and/or fiduciaries of Citigroup and because of their ability to control the business and corporate affairs of Citigroup, at all relevant times, the Individual Defendants owed Citigroup and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Citigroup in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Citigroup and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Citigroup and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Citigroup, were able to and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Citigroup, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

38.     To discharge their duties, the officers and directors of Citigroup were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Citigroup were required to, among other things:

      a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      c.     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

39.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.     Fiduciary Duties of Directors of Federal Banking Institutions**

40.     The Board has a responsibility, as part of its fiduciary duties to Citigroup and its stockholders, to oversee the operations of the Company and to maintain sufficient systems or controls to be reasonably certain that misconduct at the operational level would be elevated to the

Board and executive management for remediation.  The Board fails in that responsibility if it (i) fails to implement appropriate reporting systems or controls or (ii) consciously fails to monitor or oversee the systems and controls it put in place.

41.     While the boards of all Delaware corporations have this oversight duty, federal regulatory bodies place special emphasis on the oversight function of boards of banking institutions.  Following the mortgage crisis of the last decade that threw a spotlight on deceptive and unethical banking practices, the federal government enacted regulations and issued guidance on the duties of banks and, in particular, their boards of directors, to oversee ethics and legal compliance in their operations.  Each of these regulatory schemes is meant to ensure that large banks employ systems and controls designed to detect suspicious activity in their sprawling operations.

42.     The Federal Deposit Insurance Corporation ("FDIC") defines the duties of bank directors as follows:

> Th[e] [fiduciary duties of care and loyalty mean] that directors are responsible for selecting, monitoring, and evaluating competent management; establishing business strategies and policies; monitoring and assessing the progress of business operations; establishing and monitoring adherence to policies and procedures required by statute, regulation, and principles of safety and soundness; and for making business decisions on the basis of fully informed and meaningful deliberation.

43.     The OCC describes the primary fiduciary duties of bank directors similarly:

> To discharge their duties as Citigroup's officers and directors, and as further informed by OCC Bulletin 2014-5242, Defendants were required to exercise reasonable and prudent supervision over Citigroup's management, policies, practices, and controls of the affairs of the Company.

V.      **SUBSTANTIVE ALLEGATIONS**

   A.      **Company Background and Regulatory Environment**

44.      In its public filings, Citigroup describes itself as a global diversified financial services holding company whose businesses provide consumers, corporations, governments and institutions with a broad, yet focused, range of financial products and services, including consumer banking and credit, corporate and investment banking, securities brokerage, trade and securities services and wealth management.  Citigroup has approximately 200 million customer accounts and does business in more than 160 countries and jurisdictions.

45.      Citigroup currently operates as two primary business segments: Global Consumer Banking and Institutional Clients Group, with certain remaining operations in a segment called Corporate/Other.  The Company's public filings describe its segments using the following chart:



46.     The Company's operations are subject to numerous state, federal, and foreign laws

and regulations.  As a financial holding company, Citigroup is regulated by the Federal Reserve.

The Federal Reserve System was established in 1913 as the nation's central bank following the

Panic of 1907 to provide stability in the banking sector.  The system consists of the Board of

Governors in Washington, D.C., and 12 regional reserve banks.  In its regulatory role, the Federal

Reserve has safety and soundness examination authority for a variety of lending institutions,

including bank holding companies.  The Federal Reserve regulates the largest, most complex

financial firms operating in the United States and serves as the umbrella regulator for financial

holding companies and the primary regulator of all nonbank financial firms that are designated as systemically significant.  All bank holding companies with more than $50 billion in assets, like Citigroup, are subject to enhanced prudential regulation by the Federal Reserve.

47.     Citibank is Citigroup's primary banking subsidiary and operates consumer banking branches around the world.  As a national bank, Citibank is subject to regulation by the OCC.  The OCC was created in 1863 as part of the Department of the Treasury to supervise federally chartered banks.  The OCC has examination powers to enforce its responsibilities for the safety and soundness of nationally chartered banks.  The OCC has strong enforcement powers, including the ability to issue cease and desist orders and revoke federal bank charters.  Pursuant to the Dodd-Frank Act, the OCC is the primary regulator for federally chartered thrift institutions.

48.     Citigroup is additionally subject to regulation by federal securities regulators, including the SEC and the Commodity Futures Trading Commission ("CFTC").

49.     Beginning in approximately 2012, Citigroup and Citibank have been the subject over well over one dozen major regulatory enforcement actions including the following:

**B.      The 2012 Bank Secrecy Act Enforcement Action**

50.     On April 5, 2012, the OCC issued a Cease and Desist Order against Citibank for violating the Bank Secrecy Act ("BSA") and its underlying regulations.  The OCC found that Citibank's BSA compliance program had deficiencies with respect to internal controls, customer due diligence, the independent BSA and anti-money laundering ("AML") audit function, monitoring of its remote deposit capture and international cash letter instrument processing in connection with foreign correspondent banking, and suspicious activity reporting related to that monitoring.

51.     The OCC found that the Company had failed to adopt and implement a compliance program that adequately covered the required BSA/AML program elements due to an inadequate system of internal controls and ineffective independent testing.  The Bank did not develop adequate due diligence on foreign correspondent bank customers and failed to file Suspicious Activity Reports ("SARs") related to its remote deposit capture/international cash letter instrument activity in a timely manner.

52.     In particular, the OCC found critical deficiencies in the Company's BSA/AML compliance program including:

a.      "The Bank has internal control weaknesses including the incomplete identification of high risk customers in multiple areas of the bank, inability to assess and monitor client relationships on a bank-wide basis, inadequate scope of periodic reviews of customers, weaknesses in the scope and documentation of the validation and optimization process applied to the automated transaction monitoring system, and inadequate customer due diligence";

b.      The Bank failed to adequately conduct customer due diligence and enhanced due diligence on its foreign correspondent customers, its retail banking customers, and its international personal banking customers and did not properly obtain and analyze information to ascertain the risk and expected activity of particular customers";

c.      "The Bank self-reported to the OCC that from 2006 through 2010, the Bank failed to adequately monitor its remote deposit capture/international cash letter instrument processing in connection with foreign correspondent banking";

d.      "As a result of that inadequate monitoring, the Bank failed to file timely SARs involving remote deposit capture/international cash letter activity in its foreign correspondent banking business"; and

e.      "The Bank's independent BSA/AML audit function failed to identify systemic deficiencies found by the OCC during the examination process."

53.     In response to the OCC's findings, Citibank's board at the time, including defendant Zedillo, signed and executed a "Stipulation and Consent to the Issuance of a Consent Order."  In the Stipulation and Consent, the Board agreed to begin corrective action, and committed to taking all necessary and appropriate steps to remedy the deficiencies identified by the OCC, and to enhance the Bank's BSA/AML compliance program.

54.     The measures the Board agreed to adopt included the following: (a) maintenance of a compliance committee; (b) creation and submission of a comprehensive BSA/AML action plan; (c) enhanced processes to ensure clear lines of authority and responsibility for compliance management and accountability; (d) institution of  appropriate customer due diligence policies, procedures, and processes; (e)  development and maintenance of a written program of policies and procedures to ensure the timely and appropriate review and dispositioning of suspicious activity alerts, and the timely filing of SARs; (f) ensuring that Citibank develop, implement, and maintain clear written policies, procedures and processes governing the use of cash letter services and remote deposit capture by all clients; (g)  retention of one or more independent consultants to supervise and certify an independent review of account and transaction activity covering certain areas; (h) development and maintenance of an effective program to audit Citibank's BSA/AML compliance program; and (i) ensuring that new products and services are subject to senior level compliance review and approval.

55.     The cease and desist order concluded:

Although this Order requires the Bank to submit certain proposed actions and programs for the review or prior written determination of no supervisory objection by the Deputy Comptroller and/or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

### C.    The 2013 Federal Reserve Enforcement Action

56.    On March 26, 2013, the Federal Reserve announced the execution of an enforcement action against Citigroup and released a Consent Order dated March 21, 2013.  In the Consent Order, the Federal Reserve found that "Citigroup lacked effective systems of governance and internal controls to adequately oversee the activities of [its subsidiaries] with respect to legal, compliance, and reputational risk related to [the subsidiaries'] respective BSA/AML compliance programs."

57.    Citigroup's entire Board at the time, including defendants Corbat, Taylor, and Zedillo, agreed to implement the reforms required by the Federal Reserve: "[O]n March 19, 2013, the board of directors of Citigroup, at a duly constituted meeting, adopted a resolution authorizing [Citigroup's] Chief Compliance Officer, to enter into this Consent Order to Cease and Desist… on behalf of Citigroup and consenting to compliance with each and every applicable provision of this Order by Citigroup and its institution-affiliated parties."

58.    The Board further agreed that within 60 days of the Consent Order: "Citigroup's board of directors shall submit to the [Federal Reserve] an acceptable written plan to continue ongoing enhancements to the board's oversight of Citigroup's firmwide compliance risk management program with regard to compliance with BSA/AML Requirements."  The written plan to be submitted by Citigroup's Board was required to address:

(a)    funding for personnel, systems, and other resources as are needed to operate a BSA/AML compliance risk management program that is commensurate with the compliance risk profile of the organization and that fully addresses the organization's compliance risks on a timely and effective basis;

(b)    policies to instill a proactive approach throughout the organization in identifying, communicating, and managing BSA/AML compliance risks;

(c)     measures to ensure adherence to approved BSA/AML compliance policies, procedures, and standards, and ensure the timely completion of related projects and initiatives; and

(d)     measures to ensure the resolution of BSA/AML-related audit, compliance reviews, and examination findings.

59.     The Board agreed to the following schedule of actions:

a.     Within 60 days of the Consent Order: submit an acceptable written plan to the Federal Reserve to continue to improve the governance, structure, and operations of the compliance risk management program with regard to BSA/AML requirements and the regulations issued by the Office of Foreign Assets Control of the United States Department of the Treasury;

b.     Within 90 days of the Consent Order: complete a review of the effectiveness of Citigroup's firmwide BSA/AML compliance program and prepare a written report of findings and recommendations;

c.     Within 30 days after the end of each calendar quarter: "the board of directors of Citigroup or an authorized committee thereof" would submit to the Federal Reserve written progress reports detailing the form and manner of all actions taken to secure compliance with this Order, a timetable and schedule to implement specific remedial actions to be taken to address the recommendation in the report, and the results thereof.

**D.     The November 2014 Regulatory Actions**

**1.     The 2014 OCC Enforcement Action**

60.     On November 11, 2014, the OCC executed an enforcement action against Citibank in connection with wrongdoing in the foreign exchange ("FX") markets, forcing Citibank to enter yet another Consent Order.  Under the terms of the November 2014 OCC Consent Order, Citibank agreed to pay a penalty of $350 million for its wrongdoing.

61.     According to the Consent Order:

The OCC engaged in a joint, targeted examination of the Bank and its foreign exchange business with the Federal Reserve Bank of New York. The OCC's examination findings establish that the Bank had deficiencies in its internal controls and had engaged in unsafe or unsound banking practices with respect to the oversight and governance of the Bank's FX Trading such that the Bank failed to detect and prevent the [manipulation of the FX market].   The deficiencies and unsafe or unsound practices include the following:

(a)     The Bank's compliance risk assessment lacked sufficient granularity and failed to identify the risks related to sales, trading and supervisory employee ("Employee") market conduct in FX Trading;

(b)     The Bank's transaction monitoring and communications surveillance were inadequate to detect potential Employee market misconduct in FX Trading;

(c)     The Bank's compliance testing procedures were inadequate to measure adherence to the Bank's standards of Employee conduct and firm policies applicable to Employee market conduct in FX Trading; and

(d)     Internal audit's risk assessment and coverage of FX Trading was inadequate to assess whether the Bank's control framework was effective in identifying and mitigating compliance risks related to Employee market conduct.

The Bank's internal controls surrounding benchmarks were previously criticized by the OCC in regards to the Bank's submissions in the LIBOR (London interbank offered rate) benchmark rate setting process.

62.     Citibank's stipulation to the Consent Order was signed by defendants Desoer, Hennes, Reiner, Taylor, and Turley.

## 2.     The November 2014 CFTC Order

63.     Also on November 11, 2014, the CFTC issued an Order Instituting Proceedings pursuant the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions (the "CFTC Order") against Citibank.  The CFTC Order found:

During the Relevant Period, Citibank failed to adequately assess the risks associated with its FX traders participating in the fixing of certain FX benchmark rates. Citibank also lacked adequate internal controls in order to prevent its FX traders from engaging in improper communications with certain FX traders at other banks. Citibank lacked sufficient policies, procedures and training specifically governing participation in trading around the FX benchmarks rates and had inadequate policies pertaining to, or insufficient oversight of, its FX traders' use of chat rooms or other electronic messaging.

64.     The CFTC imposed a $310 million penalty on Citibank.

### 3.     The November 2014 Financial Conduct Authority Order

65.     Finally, on November 11, 2014, the United Kingdom's Financial Conduct Authority ("FCA") entered an order against Citibank for substantially the same conduct as the November 2014 OCC Consent Order and the CFTC Order.  The FCA order assessed a financial penalty of £225,575,000, or approximately $353.1 million dollars at the time, against Citibank.

### E.     The 2015 Regulatory Actions

### 1.     The Federal Reserve Enforcement Action

66.     On May 20, 2015, the Federal Reserve announced that it had executed yet another enforcement action against Citigroup.  This time, the Federal Reserve action, like the November 2014 enforcement actions by the OCC, CFTC, and FCA, was due to  unsafe and unsound practices in the FX markets caused by deficiencies in the Company's oversight and internal controls over traders buying and selling U.S. dollars and foreign currencies for the organizations' own accounts and for customers.

67.     In the Consent Order, the Federal Reserve found that from 2008 through 2013:

a.     "Citigroup lacked adequate firm-wide governance, risk management, compliance and audit policies and procedures to ensure that the firm's Covered FX Activities conducted at the Bank complied with safe and sound banking practices, applicable U.S. laws and regulations, including policies and procedures to prevent potential violations of the U.S. commodities, antitrust and criminal fraud laws, and applicable internal policies…";

b.     "Citigroup's deficient policies and procedures prevented Citigroup from detecting and addressing unsafe and unsound conduct by the Bank's FX traders, including in communications by traders in multibank chatrooms…"; and

19

c.      "Citigroup's deficient policies and procedures prevented Citigroup from detecting and addressing unsafe and unsound conduct by the Bank's FX sales personnel…";

68.     To resolve the enforcement action, Citigroup's Board agreed to pay a $342 million penalty to the Federal Reserve, and the Board agreed to take the following schedule of actions:

a.      Within 90 days: "the board of directors of Citigroup or an authorized committee thereof shall submit a written plan acceptable to the Reserve Bank to improve senior management's oversight of Citigroup's compliance with applicable U.S. laws and regulations and applicable internal policies in connection with the firm's Designated Market Activities," which expressly must include "periodic monitoring by senior management and reporting to the board of directors or an authorized committee thereof on the status and results of measures taken, or to be taken, to correct identified deficiencies and to comply with this Order and to ensure the ongoing efficacy of Citigroup's overall program";

b.      Within 90 days: submit an enhanced written internal controls and compliance program acceptable to the Federal Reserve to comply with applicable U.S. laws and regulations with respect to Citigroup's FX trading activities;

c.      Within 90 days: "submit a written plan acceptable to the Reserve Bank to improve its compliance risk management program with regard to compliance by the firm with applicable U.S. laws and regulations with respect to Designated Market Activities firm-wide," specifically including: "measures to ensure that material risk management issues related to potential employee misconduct in connection with the firm's Designated Market Activities are escalated to and addressed in a timely manner by senior management and the board of directors or a committee thereof, as appropriate";

d.      Within 90 days of each anniversary of the Consent Order: submit the results of a controls review consisting of: (i) a review of compliance policies and procedures applicable to the firm's Designated Market Activities and their implementation, and (ii) an appropriate risk-focused sampling of other key controls for Citigroup's firm-wide Designated Market Activities;

e.      Within 90 days: submit an enhanced written internal audit program acceptable to the Federal Reserve with respect to the firm's compliance with applicable U.S. laws and regulations in its Designated Market Activities.

f.      Within 30 days after the end of the first full calendar quarter following the Consent Order, and quarterly thereafter: submit to the Federal Reserve written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.

### 2.      The Department of Justice Plea Agreement

69.      Also on May 20, 2015, the DOJ announced that Citigroup had entered a guilty plea to felony charges of conspiring to manipulate the price of U.S. dollars and euros exchanged in the foreign currency exchange spot market.  Appended to the plea agreement was a certificate executed by Citigroup's Assistant Secretary attaching resolutions adopted by Citigroup's Board on May 11, 2015, agreeing to plead guilty on behalf of Citigroup and Citicorp.

70.      On January 10, 2017, Citigroup was sentenced and ordered to pay $925 million for the wrongdoing it admitted in its guilty plea.

### 3.      The July 2015 OCC Action

71.      On July 20, 2015, the OCC entered a Consent Order against Citibank after identifying deficiencies in Citibank's practices that resulted in violations of Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a)(1), related to billing practices with

regard to identity protection products and marketing and sales practices with regard to debt

cancellation products.  In the Consent Order, the OCC found the following, which Citibank neither

admitted nor denied:

> (1) From March 2000 to September 2011, the Bank and its vendors marketed and sold identity protection products, the advertised benefits of which included triple bureau credit monitoring and credit report retrieval, to certain Bank customers and other consumers.

> (2) Bank customers or other consumers who enrolled in the identity protection products were required to provide sufficient personal verification information or authorization before each of their credit bureau reports could be accessed. Customers of the identity protection products were provided the materials necessary to submit this information or authorization, but until the information or authorization was submitted, the customers could not receive the full credit monitoring and/or credit report retrieval services of the identity protection product in which they were enrolled.

> (3) From 2000 to February 2013, the Bank, through its vendors, billed customers of identity protection products who were not receiving the full credit monitoring and/or credit report retrieval services for the full fee of the product, even though those customers were not receiving all of the benefits of the product.

> (4) By reason of the foregoing billing practices for its identity protection products as described in Paragraphs (1) to (3) of this Article, the Bank engaged in unfair practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1). This violation of Section 5 of the FTC Act caused substantial consumer injury or was likely to cause substantial consumer injury.

> (5) Since 2003, the Bank has marketed and sold debt cancellation products in connection with certain Bank-branded and store-branded credit cards issued by the Bank. These products included cancellation of a portion of a customer's credit card balance upon the occurrence of certain defined qualifying events.

> (6) From 2003 through August 2012, the Bank's telemarketing and telesales practices for the debt cancellation products could have misled reasonable consumers about material information regarding the Bank's debt cancellation products. Specifically, telesales agents (i) omitted information during the sales calls that was necessary to correct or clarify apparent consumer misunderstandings about product cost, features, or eligibility requirements; (ii) made affirmative false statements about product cost and benefits; and (iii) failed to obtain consumers' informed and affirmative consent prior to enrolling them in the products.

> (7) From 2008 through August 2012, the point-of-sale application process for one of the DSNB store-branded credit card products included solicitation via pin-pad

for Credit Protection. The Bank failed to provide adequate and conspicuous disclosure during the point-of sale application process that the Credit Protection product was separate from the credit card product, and failed to implement appropriate controls to ensure consumers provided informed and affirmative consent to purchase the optional product. As a result, consumers may have unintentionally enrolled in Credit Protection or mistakenly believed that enrollment in Credit Protection was a required part of the credit application process.

(8) In selling debt cancellation products, Bank telesales agents' oral disclosures were not readily understandable, as required by 12 C.F.R. Part 37.

(9) By reason of the foregoing telemarketing, telesales, and point-of-sale practices for its debt cancellation products as described in Paragraphs (5) to (8) of this Article, the Bank engaged in unfair and deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1) and violated 12 C.F.R. Part 37. These violations of Section 5 of the FTC Act and Part 37 are part of a pattern of misconduct and resulted in financial gain to the Bank.

72.     In the Consent Order, Citibank's board agreed to pay a $35 million fine and implement numerous internal controls on a specific schedule.  The accompanying Stipulation and Consent to the Issuance of a Consent Order was signed by defendants Desoer, Hennes, Henry, Reiner, Taylor, and Turley.

### F.     The 2017 OCC Enforcement Actions

#### 1.     Violations of the National Flood Insurance Act

73.     On October 10, 2017, the OCC entered a Consent Order against Citibank after identifying deficiencies in Citibank's internal controls that resulted in pattern or practice of violations of the National Flood Insurance Act of 1968, as amended, and/or the Flood Disaster Protection Act of 1973.  In the Consent Order, Citibank agreed to pay a monetary penalty of $452,000.  Defendants Costello, Desoer, Hennes, and Turley signed the Consent Order.

#### 2.     Violations of the April 2012 OCC Consent Order

74.     On December 27, 2017, the OCC entered a Consent Order against Citibank after finding that it was "in violation of a prior OCC Consent Cease and Desist Order for BSA/AML deficiencies issued on April 5, 2012 (2012 Consent Order), in which the OCC identified

deficiencies in the Bank's [BSA/AML] compliance program." The OCC found: "The Bank has not timely achieved compliance with the 2012 Consent Order and is in violation of the 2012 Consent Order (from September 30, 2015, to the date of this Order)." In order to settle the allegations, Citibank's Board agreed to a $70 million monetary penalty. Defendants Costello, Desoer, Hennes, Ireland, and Turley signed the Consent Order.

### G.    The 2019 Proxy Statement

75.    On March 6, 2019, defendants Corbat, Costello Dailey, Desoer, Dugan, Hennes, Henry, Ireland, Jacobs, James, Reiner, Taylor, Turley, Wright, and Zedillo caused Citigroup to file the 2019 Proxy Statement in connection with the 2019 annual stockholders meeting to be held on April 16, 2019. In the 2019 Proxy Statement, these defendants solicited stockholder votes to, among other things, (i) re-elect themselves to the Board; and (ii) approve Citigroup's 2019 Stock Incentive Plan. With respect to these solicited votes, these Individual Defendants issued materially false or misleading statements.

76.    The 2019 Proxy Statement made numerous false or misleading statements regarding Citigroup's corporate governance and regulatory compliance, including the following, which the Company highlighted on page 4 of the 139-page Proxy Statement:

> Management also made progress on the regulatory front last year, which we believe is critical to the firm's success. Citi again achieved a successful result in the Federal Reserve's annual Comprehensive Capital Analysis and Review (CCAR) stress test, enabling the return of over $18 billion of capital to common shareholders during the calendar year, while maintaining levels of regulatory capital well in excess of minimum requirements. In addition, Citi made headway on a range of heightened regulatory requirements that all large banks have faced in the wake of the financial crisis. Nevertheless, your Board will continue to pay close attention to – and expect management to make continued progress on – regulatory matters in 2019 and beyond.

* * *

> Citigroup Inc. (Citigroup, Citi, or the Company) continually strives to maintain the highest standards of ethical conduct: reporting results with accuracy and

transparency and maintaining full compliance with the laws, rules, and regulations that govern Citi's businesses. Citi is active in ensuring its governance practices are at the leading edge of best practices.

77.     The 2019 Proxy Statement made the following false or misleading statements in

connection with the Board's evaluation of its own performance and nominating process:

> The Nomination, Governance and Public Affairs Committee nominates one of the members of the Board to serve as Chair of the Board on an annual basis. The Nomination, Governance and Public Affairs Committee also conducts an annual review of Board performance in which the full Board participates, and each standing committee (except for the Executive Committee) conducts its own self-evaluation. As part of the self-evaluation, the Board engages in an examination of its own performance of its obligations with regards to such matters as regulatory requirements, strategic and financial oversight, oversight of risk management, executive compensation, succession planning, and governance matters, among many other topics. The committees evaluate their performance against the requirements of their charters and other aspects of their responsibilities. The full Board and each committee then discuss the results of their respective self-evaluations in executive session, highlighting actions to be taken in response to the discussion.

* * *

> In considering the composition of the Board of Directors, the Nomination, Governance and Public Affairs Committee inventories the categories of risks faced by Citi, given its size, business mix, and geographical presence, and seeks to identify candidates with the skills and experience necessary to enable the Board of Directors to provide proper oversight of those risks…. The Board's composition, and the individuals nominated for consideration by stockholders, are the result of careful consideration by the Committee of the correspondence between the risk inventory and skills and experience of the Board members and candidates. In addition to the ability to assist the Board in its oversight of a particular risk or risks, as more fully described in each nominee's biography, the members of the Board are assessed based on a variety of factors…

78.     In particular, the 2019 Proxy Statement identifies eleven specific areas of

"experience and abilities" that the Nomination, Governance and Public Affairs Committee

determined are "necessary" and which director nominees should possess to enable Citigroup to

meet its "unique needs as a highly regulated financial services company."  Presumably to aid

stockholders determining how to vote for director nominees, the 2019 Proxy Statement identified

each of the eleven areas of expertise and experience with a particular icon, which, the Proxy Statement claimed, appear in the biographies of director nominees possessing that particular category of experience and ability.  Of particular relevance are the following icons and their descriptions:



Citi aspires to the highest standards of corporate governance and ethical conduct: doing what we say, reporting results with accuracy and transparency, and maintaining compliance with the laws, rules, and regulations that govern the Company's businesses. The Board is responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance policies and the guidelines. To carry out these responsibilities, the Board must include experienced leaders in the area of corporate governance who must be familiar with governance issues, the constituencies most interested in those issues, and the impact that governance policies have on the functioning of a company.



In addition to the regulatory supervision described below, Citi is subject to myriad laws and regulations and is party to legal actions and regulatory proceedings from time to time. Citi's Board has an important oversight function with respect to compliance with applicable requirements, monitors the progress of legal proceedings, and evaluates major settlements. Citi's Board must include members with experience in regulatory compliance, as well as an understanding of complex litigation and litigation strategies.



Citi and its subsidiaries are regulated and supervised by numerous regulatory agencies, both domestically and internationally, including in the U.S. the Federal Reserve Board, the Office of the Comptroller of the Currency, the FDIC, the Consumer Financial Protection Bureau, and state banking and insurance departments, as well as international financial services authorities. Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements and fostering productive relationships with its regulators. Given the critical importance of ethics, conduct and culture, Citi's Board must include members with experience overseeing ethics and compliance and building an effective, values-based ethics and compliance program.



Risk management is a critical function of a complex global financial services company and its proper supervision requires Board members with sophisticated risk management skills and experience. Directors provide oversight of the Company's risk management framework, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation. Given increased cybersecurity threats, Citi's Board must have members who have sufficient experience to enable them to oversee management's efforts to monitor, detect and prevent cyber threats to Citi. Citi's Board must include members with risk expertise to assist Citi in its efforts to properly identify, measure, monitor, report, analyze, and control or mitigate risk.

79.     The 2019 Proxy Statement stated "[e]ach nominee's biography highlights his or her particular skills, qualifications, and experience that support the conclusion of the Nomination, Governance and Public Affairs Committee that the nominee is extremely qualified to serve on Citi's Board."  Using the four icons reproduced above, the 2019 Proxy Statement identified various

director nominees as having expertise or experience in the field represented by the icon. However, the 2019 Proxy Statement misleadingly omitted that each director nominee identified with one of the for icons was failing to implement internal controls necessary for legal and regulatory compliance, and failing to adequately manage serious enterprise risks:

   a.  Misleadingly identified with the Corporate Governance icon were the following defendants: Dugan, Henry, Taylor, and Zedillo.

   b.  Misleadingly identified with the Legal Matters icon was defendant Dugan.

   c.  Misleadingly identified with the Regulatory and Compliance icon were the following defendants: Corbat, Dailey, Desoer, Dugan, Hennes, Taylor, Turley, Wright, and Zedillo.

   d.  Misleadingly identified with the Risk Management icon were the following defendants: Costello, Dailey, Desoer, Dugan, Hennes, Ireland, Jacobs, James, Turley, Wright, and Zedillo.

   80.  The 2019 Proxy Statement made the following false or misleading statements in connection with the Board's role in risk oversight:

> At each regularly scheduled Board meeting, the Board receives a risk report from the Chief Risk Officer with respect to the Company's approach to management of major risks, including management's risk mitigation efforts, where appropriate. Independent Risk Management, led by the Chief Risk Officer, is a company-wide function that is responsible for an integrated effort to set standards and actively manage and oversee aggregate risks that may affect Citi's ability to execute on its corporate strategy and fulfill its business objectives. The Board's role is to oversee this effort.
>
> The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies
>
>        * * *
>
> The Risk Management Committee has been delegated authority to assist the Board in fulfilling its responsibility with respect to (i) oversight of Citigroup's risk

management framework, including the significant policies and practices used in managing credit, market, operational, and certain other risks…. The Committee reports to the Board of Directors regarding Citigroup's risk profile and its risk management framework, including the significant policies and practices employed to manage risks in Citigroup's businesses, and the overall adequacy of the Risk Management function. The Committee provides oversight of Citi's CCAR and Resolution and Recovery Planning efforts. The Committee also reviews risk related to information security and cybersecurity, including steps taken by management to control such risks, and coordinates with the Personnel and Compensation Committee in relation to that committee's role with respect to risk matters related to compensation, which includes the approval of the Global Head of FCR's base compensation, adjustments and incentive compensation.

The Risk Management Committee created a subcommittee in 2016 to provide oversight of data governance, data quality, and data integrity. Ms. James and Messrs. Santomero (Chair) and Turley are members of the Risk Subcommittee. The Risk Subcommittee met 9 times in 2018.

81.     The 2019 Proxy Statement made the following false or misleading statements in connection with Citigroup's ethics programs:

We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture.

Governance over Culture

The cornerstone of our approach to culture is our governance framework, which begins with a strong "tone from the top" starting with the Citigroup Board of Directors. In 2014, Citi's Board established a standing Ethics, Conduct and Culture Committee of the Board to oversee senior management's ongoing efforts to foster a culture of ethics throughout Citi….

With oversight from the Ethics, Conduct and Culture Committee, senior management has undertaken a number of efforts in support of Citi's culture, including developing Citi's Mission and Value Proposition and Leadership Standards. On an ongoing basis, the Ethics, Conduct and Culture Committee remains responsible for overseeing senior management's efforts to reinforce and enhance a culture of ethics within Citi, which includes:

●       Overseeing efforts to enhance and communicate Citi's Mission and Value Proposition, evaluating management's progress, and providing feedback on these efforts;

- Overseeing management's efforts to support ethical decision-making in the organization, evaluating management's progress and providing feedback on these efforts; and

- Reviewing Citi's Code of Conduct and Code of Ethics for Financial Professionals.

* * *

The Citi Code of Ethics for Financial Professionals applies to Citi's Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer), Controller (Principal Accounting Officer), and all finance professionals and administrative staff in a finance role, including Controllers, Finance & Risk Shared Services, Finance and Risk Infrastructure, Financial Planning & Analysis and Strategy, Treasury, Tax, M&A, Investor Relations, and the Regional/Business teams. Citi expects all of its employees to act in accordance with the highest standards of personal and professional integrity in all aspects of their activities, to comply with all applicable laws, rules, and regulations, to deter wrongdoing, and abide by the Citi Code of Conduct and other policies and procedures adopted by Citi that govern the conduct of its employees.

82.     Those statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing undisclosed material legal and compliance risks that could affect the Company; and (iii) had policies to implement adequate internal controls.

83.     The 2019 Proxy Statement omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013. The 2019 Proxy Statement also omitted any disclosures reflecting or acknowledging that defendants failed to take appropriate steps to address the inadequate internal controls, even after years of red flags alerting them to the improper behavior.

84.     The 2019 Proxy Statement harmed Citigroup by interfering with proper governance on its behalf that follows stockholders' informed voting of directors.  As a result of the false or misleading statements in the 2019 Proxy Statement, Citigroup stockholders voted to re-elect

Defendants Corbat, Costello Dailey, Desoer, Dugan, Hennes, Henry, Ireland, Jacobs, James, Reiner, Taylor, Turley, Wright, and Zedillo to the Board.

85.    The 2019 Proxy Statement also harmed Citigroup by obtaining shareholder approval of the Citigroup 2019 Stock Incentive Plan which resulted in millions of dollars in equity compensation paid to wrongdoers.  As a result of the false or misleading statements in the 2019 Proxy Statement, Citigroup stockholders voted to approve 2019 Stock Incentive Plan.

### H.    The 2019 OCC Enforcement Actions

#### 1.    Consent Order for Violation of the Fair Housing Act

86.    On March 19, 2019, the OCC entered a Consent Order against Citibank after finding that it had violated the Fair Housing Act.  The OCC found, and Citibank neither admitted nor denied:

> (1) In August 2011, the Bank piloted a Relationship Loan Pricing ("RLP") program and in February 2012, more widely implemented it across its customer base. Under the RLP program, customers who (i) had a qualifying banking relationship with Citibank at the time of the mortgage loan origination, and (ii) applied for RLP eligible mortgages could receive either a credit to closing costs or an interest rate reduction.
>
> (2) The Bank failed to ensure effective risk management and internal controls, including inadequate periodic reviews, over the RLP program, including: (a) From August 2011 to April 2015, the Bank failed to provide adequate training to loan officers regarding how to offer RLP to Bank customers.
>
> (b) From August 2011 to November 2014, the Bank's written guidelines did not explicitly instruct loan officers to offer RLP to all eligible customers and the Bank did not require its loan officers to document the basis for the customer's rejection.
>
> (c) From August 2011 to January 2015, the Bank did not require its loan officers to inform customers of all discount programs for which they may  have been eligible.
>
> (3) As a result of the ineffective risk management and control weaknesses, certain Bank borrowers did not receive the RLP benefit for which they were eligible and were adversely affected on the basis of their race, color, national origin, and/or sex.
>
> (4) After finding in 2014 that certain Bank customers had not received the correct RLP benefit, the Bank, in 2015, self-reported its findings to the OCC.

(5) In 2018, the OCC notified the Bank that the conduct described in paragraphs (2) and (3) of this Article constituted violations of the Fair Housing Act, 42 U.S.C. § 3601—19, and its implementing regulation, 24 C.F.R. Part 100.

87.     In order to settle the allegations, Citibank's board agreed to a $25 million monetary penalty.  Defendants Costello, Desoer, Hennes, Ireland, and Turley signed the stipulation to the Consent Order.

### 2.     Consent Order for Violations of 12 U.S.C. § 29

88.     On October 11, 2019, the OCC entered a Consent Order against Citibank after finding that it had engaging in violations relating to the holding period of other real estate owned ("OREO"), 12 U.S.C. § 29 and 12 C.F.R. § 34.82.  The OCC found, and Citibank neither admitted nor denied:

(1) The Bank engaged in repeated violations of the statutory holding period for OREO in 12 U.S.C. § 29 and 12 C.F.R. § 34.82, including over 200 violations alone between April 4, 2017 and August 14, 2019.

(2) In 2015, the Bank reviewed its OREO processes and portfolio and identified violations of 12 U.S.C. § 29 and 12 C.F.R. § 34.82. These violations resulted from the Bank's deficient processes and controls in the identification and monitoring of the OREO holding period. Specifically, the Bank lacked adequate policies, procedures, and processes to effectively identify and monitor the holding period for OREO assets. The Bank committed to developing and implementing corrective actions to address these deficiencies.

(3) Subsequently, the Bank submitted multiple requests to extend the holding period for OREO assets. These requests were not made timely and resulted in numerous additional violations.

(4) On April 4, 2017, the OCC notified the Bank that its internal controls governing OREO remained decentralized, ineffective, and inadequate.

(5) Since April 4, 2017, the Bank continued to submit numerous untimely requests to  extend the OREO holding period for properties held in violation of 12 U.S.C. § 29 and 12 C.F.R. § 34.82.

(6) Following additional efforts to correct the root cause of the continued OREO holding period violations, the Bank recommitted to implementing corrective actions by August 31, 2018. The Bank failed to meet its commitment, resulting in additional violations of 12 U.S.C. § 29 and 12 C.F.R. § 34.82.

89.     In order to settle the allegations, Citibank's Board agreed to a $30 million monetary penalty.  Defendants Costello, Desoer, Hennes, Ireland, Turley, and Wright signed the stipulation to the Consent Order.

### I.     The January 2020 OCC Consent Order

90.     On January 17, 2020, the OCC entered a Consent Order against Citibank after finding that it had engaged in a pattern or practice of violations of the Flood Disaster Protection Act (the "Flood Act").  The OCC found, and Citibank neither admitted nor denied:

> (1) The Bank makes, increases, extends, and renews loans secured by buildings or mobile homes ("Collateral") located in in a special flood hazard area in which flood insurance is available under the Flood Act ("Designated Loans") and employs a Flood Act compliance program to monitor its Designated Loans.

> (2) The Bank has a Flood Act compliance program to monitor its Designated Loans to ensure the Collateral securing the Designated Loans are appropriately covered by flood insurance. As part of its Flood Act compliance program, the Bank utilized a third-party to service Designated Loans within its residential lending units to notify the borrowers and force place flood insurance when the flood insurance failed to appropriately cover the Collateral.

> (3) In 2017, the OCC commenced an examination of the Bank's Flood Act compliance program and found the Bank's policies and procedures allowed its third-party servicer to extend the 45-day period after notification to the borrower resulting in the untimely force placement of flood insurance on Designated Loans.

> (4) Since at least 2014, the Bank failed to force place insurance in a timely manner on residential Designated Loans and engaged in a pattern or practice of violations of the Flood Act  and its implementing regulations, including 12 C.F.R. § 22.7(a) (Force placement of flood insurance)

91.     In order to settle the allegations, Citibank's Board agreed to a $17.9 million monetary penalty.  Defendants Costello, Desoer, Hennes, Ireland, Turley, and Wright signed the stipulation to the Consent Order.

### J.     The 2020 Proxy Statement

92.     On March 11, 2020, Defendants  Corbat, Costello Dailey, Desoer, Dugan, Hennes, Henry, Ireland, Jacobs, James, Reiner, Taylor, Turley, Wright, Wynaendts, and Zedillo caused

Citigroup to file the 2020 Proxy Statement in connection with the 2020 annual stockholders meeting to be held on April 21, 2020.  In the 2020 Proxy Statement, these defendants solicited stockholder votes to, among other things, (i) re-elect themselves to the Board; and (ii) approve additional authorized shares under the Citigroup 2019 Stock Incentive Plan. With respect to each of these solicited votes, these Individual Defendants issued materially false or misleading statements.

93.    The 2020 Proxy Statement made numerous false or misleading statements regarding Citigroup's corporate governance and regulatory compliance, including the following, which the Company highlighted on page 4 of the 189-page Proxy Statement:

> With respect to regulatory matters, Citi again achieved a successful result in the Federal Reserve's annual Comprehensive Capital Analysis and Review (CCAR), resulting in a return of capital to common shareholders of $22.3 billion during the calendar year, while maintaining levels of capital and liquidity well in excess of minimum requirements. In addition, the Federal Reserve and the Federal Deposit Insurance Corporation once again determined that the company's Resolution Plan had no deficiencies, although we did receive one shortcoming, as did several other large banks, related to governance mechanisms. More broadly, the Board remains deeply focused on Citi making substantial progress towards the termination of outstanding enforcement orders and on other remediation projects, recognizing and expecting that this progress will continue to require a substantial commitment of time and resources by both management and the Board

> * * *

> Citigroup Inc. (Citigroup, Citi, or the Company) continually strives to maintain the highest standards of ethical conduct: reporting results with accuracy and transparency and maintaining full compliance with the laws, rules, and regulations that govern Citi's businesses. Citi is active in ensuring its governance practices are at the leading edge of best practices.

94.    The 2020 Proxy Statement made the following false or misleading statements in connection with the Board's evaluation of its own performance and nominating process:

> The Nomination, Governance and Public Affairs Committee conducts an annual review of Board performance in which the full Board participates, and each standing committee (except for the Executive Committee) conducts its own self-evaluation. As part of the self-evaluation, the Board engages in an examination of

its own performance of its obligations with regard to such matters as regulatory requirements, strategic and financial oversight, oversight of risk management, executive compensation, succession planning, and governance, among many other topics. The committees evaluate their performance against the requirements of their charters and other aspects of their responsibilities. The full Board and each committee then discuss the results of their respective self-evaluations in executive session, highlighting actions to be taken in response to the discussion.

\* \* \*

In considering the composition of the Board of Directors, the Nomination, Governance and Public Affairs Committee inventories the categories of risks faced by Citi, given its size, business mix, and geographical presence, and seeks to identify candidates with the skills and experience necessary to enable the Board of Directors to provide proper oversight of those risks…. The Board's composition, and the individuals nominated for consideration by stockholders, are the result of careful consideration by the Committee of the correspondence between the risk inventory and skills and experience of the Board members and candidates. In addition to the ability to assist the Board in its oversight of a particular risk or risks, as more fully described in each nominee's biography, the members of the Board are assessed based on a variety of factors

95.     In particular, the 2020 Proxy Statement identifies twelve specific areas of "expertise and experience" that the Nomination, Governance and Public Affairs Committee has determined are "critically important to Citi's proper operation and success" and which director nominees should possess to enable Citigroup to meet its "unique needs as a highly regulated financial services company."  Presumably to aid stockholders determining how to vote for director nominees, the 2020 Proxy Statement identified each of the twelve areas of expertise and experience with a particular icon, which, the Proxy Statement claimed, appear in the biographies of director nominees possessing that particular category of expertise and experience.  Of particular relevance are the following icons and their descriptions:



Citi aspires to the highest standards of corporate governance and ethical conduct: doing what we say, reporting results with accuracy and transparency, and maintaining compliance with the laws, rules, and regulations that govern the Company's businesses. The Board is responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance policies and the guidelines. To carry out these responsibilities, the Board must include experienced leaders in the area of corporate governance who must be familiar with governance issues, the constituencies most interested in those issues, and the impact that governance policies have on the functioning of a company.



In addition to the regulatory supervision described below, Citi is subject to myriad laws and regulations and is party to legal actions and regulatory proceedings from time to time. Citi's Board has an important oversight function with respect to compliance with applicable requirements, monitors the progress of legal proceedings, and evaluates major settlements. Citi's Board must include members with experience in regulatory compliance, as well as an understanding of complex litigation and litigation strategies.



Citi and its subsidiaries are regulated and supervised by numerous regulatory agencies, both domestically and internationally, including in the U.S. the Federal Reserve Board, the Office of the Comptroller of the Currency, the FDIC, the Consumer Financial Protection Bureau, and state banking and insurance departments, as well as international financial services authorities. Having Directors with experience interacting with regulators or operating businesses

subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements and fostering productive relationships with its regulators. Given the critical importance of ethics, conduct and culture, Citi's Board must include members with experience overseeing ethics and compliance and building an effective, values-based ethics and compliance program



Risk management is a critical function of a complex global financial services company and its proper supervision requires Board members with sophisticated risk management skills and experience. Directors provide oversight of the Company's risk management framework, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation. Given increased cybersecurity threats, Citi's Board must have members who have sufficient experience to enable them to oversee management's efforts to monitor, detect and prevent cyber threats to Citi. Citi's Board must include members with risk expertise to assist Citi in its efforts to properly identify, measure, monitor, report, analyze, and control or mitigate risk.

96. The 2020 Proxy Statement stated "[e]ach nominee's biography highlights his or her particular skills, qualifications, and experience that support the conclusion of the Nomination, Governance and Public Affairs Committee that the nominee is extremely qualified to serve on Citi's Board." Using the four icons reproduced above, the 2020 Proxy Statement identified various director nominees as having expertise or experience in the areas represented by the icons. However, the 2020 Proxy Statement misleadingly omitted that each director nominee identified with one of the four icons was failing to implement internal controls necessary for legal and regulatory compliance, and failing to adequately manage serious enterprise risks:

a. Misleadingly identified with the Corporate Governance icon were the following defendants: Dugan, Henry, Taylor, and Zedillo.

b.      Misleadingly identified with the Legal Matters icon was defendant Dugan.

c.      Misleadingly identified with the Regulatory and Compliance icon were the following defendants: Corbat, Dailey, Desoer, Dugan, Hennes, Ireland, Taylor, Turley, Wright, Wynaendts, and Zedillo.

d.      Misleadingly identified with the Risk Management icon were the following defendants: Costello, Dailey, Desoer, Dugan, Hennes, Ireland, James, Turley, Wright, Wynaendts, and Zedillo.

97.     The 2020 Proxy Statement made the following false or misleading statements in connection with the Board's role in risk oversight:

> At each regularly scheduled Board meeting, the Board receives a risk report from the Chief Risk Officer with respect to the Company's approach to management of major risks, including management's risk mitigation efforts, where appropriate. Independent Risk Management, led by the Chief Risk Officer, is a company-wide function that is responsible for an integrated effort to set standards and actively manage and oversee aggregate risks that may affect Citi's ability to execute on its corporate strategy and fulfill its business objectives. The Board's role is to oversee this effort.
>
> The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies
>
> * * *
>
> The Risk Management Committee has been delegated authority to assist the Board in fulfilling its responsibility with respect to (i) oversight of Citigroup's risk management framework, including the significant policies and practices used in managing credit, market, operational, and certain other risks…. The Committee reports to the Board of Directors regarding Citigroup's risk profile and its risk management framework, including the significant policies and practices employed to manage risks in Citigroup's businesses, and the overall adequacy of the Risk Management function. The Committee provides oversight of Citi's CCAR and Resolution and Recovery Planning efforts. The Committee also reviews risk related to information security and cybersecurity, including steps taken by management to control such risks, and approves the Global Head of GRR's base compensation, adjustments and incentive compensation.

The Risk Management Committee created a subcommittee in 2016 to provide oversight of data governance, data quality, and data integrity. Mses. Desoer and James (Chair) and Messrs. Dugan, McQuade and Turley are members of the Data Quality Subcommittee. The Data Quality Subcommittee met 12 times in 2019

98.     The 2020 Proxy Statement made the following false or misleading statements in

connection with Citigroup's ethics programs:

We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture.

Governance over Culture

The cornerstone of our approach to culture is our governance framework, which begins with a strong "tone from the top" starting with the Citigroup Board of Directors. In 2014, Citi's Board established a standing Ethics, Conduct and Culture Committee of the Board to oversee senior management's ongoing efforts to foster a culture of ethics throughout Citi. For more information, please see the Ethics, Conduct and Culture Committee Charter, which is set forth on Citi's website at www.citigroup.com.

With oversight from the Ethics, Conduct and Culture Committee, senior management has undertaken a number of efforts in support of Citi's culture, including developing Citi's Mission and Value Proposition and Leadership Standards. On an ongoing basis, the Ethics, Conduct and Culture Committee remains responsible for overseeing senior management's efforts to reinforce and enhance a culture of ethics within Citi, which includes:

●      Overseeing efforts to enhance and communicate Citi's Mission and Value Proposition, evaluating management's progress, and providing feedback on these efforts;

●      Overseeing management's efforts to support ethical decision-making in the organization, evaluating management's progress and providing feedback on these efforts; and

●      Reviewing Citi's Code of Conduct and Code of Ethics for Financial Professionals.

* * *

The Citi Code of Ethics for Financial Professionals applies to Citi's Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer) and Controller (Principal Accounting Officer) and all Finance Professionals and Administrative Staff in a finance role, including but not limited

to Controllers, Finance & Risk Shared Services (FRSS), Capital Planning, Financial Planning & Analysis, Productivity and Strategy, Treasury, Tax, M&A, Investor Relations and the Regional/Business teams. Citi expects all of its employees to act in accordance with the highest standards of personal and professional integrity in all aspects of their activities, to comply with all applicable laws, rules, and regulations, to deter wrongdoing, and abide by the Citi Code of Conduct and other policies and procedures adopted by Citi that govern the conduct of its employees

99.   The foregoing statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing undisclosed material compliance and regulatory risks that could affect the Company; and (iii) had policies to implement adequate internal controls.

100.   The 2020 Proxy Statement omitted any disclosures regarding (i) Citigroup's ineffective internal and disclosure controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013. The 2020 Proxy Statement also omitted any disclosures reflecting or acknowledging that Defendants failed to take appropriate steps to address the inadequate internal controls, even after years of red flags alerting them to the improper behavior.

101.   The 2020 Proxy Statement harmed Citigroup by interfering with proper governance on its behalf that would have occurred had stockholders been informed when voting for directors. As a result of the false or misleading statements in the 2020 Proxy Statement, Citigroup stockholders voted to re-elect Defendants Corbat, Costello Dailey, Desoer, Dugan, Hennes, Henry, Ireland, Jacobs, James, Reiner, Taylor, Turley, Wright, Wynaendts, and Zedillo to the Board.

102.   The 2020 Proxy Statement also harmed Citigroup by obtaining shareholder approval of the amendment to Citigroup 2019 Stock Incentive Plan which resulted in Citigroup increasing the number of shares authorized for grants under the plan by 15 million.  As a result of

the false or misleading statements in the 2020 Proxy Statement, Citigroup stockholders voted to approve the amendment.

## VI.   The True Scope of Citigroup's Deficient Internal Controls is Slowly Revealed

### A.   The $900 Million "Inadvertent Mistake"

103.   On August 14, 2020, media reports revealed the true scope of Citigroup's ineffective internal control environment: the Company had "inadvertently" wired $900 million to lenders of Revlon Inc.  As reported that day by *Bloomberg*:

> Even for Citigroup Inc., it was big money.  On Wednesday, loan operations staff at the New York bank wired $900 million, seemingly on behalf of Revlon Inc., to lenders of the troubled cosmetics giant controlled by billionaire Ron Perelman.
>
> It was a mistake for the ages -- a "clerical error," as Citigroup told lenders -- that's now plunged the bank into a battle between the Perelman empire and a corps of sharp-edged investment funds that have become its impatient creditors.
>
> * * *
>
> The wayward transfer of nearly a billion dollars appears to be one of the biggest screw-ups on Wall Street in ages, and it's set tongues wagging in financial markets. The question everyone is asking: how could this happen?
>
> * * *
>
> "It's a billion-dollar clerical error," said Michael Stanton, a former restructuring and bankruptcy adviser. "This is probably knocking around some very big rooms at Citibank."

104.   Two days later, on August 19, 2020, *Bloomberg* reported that the incident had drawn scrutiny from federal regulators:

> Citigroup Inc. has started briefing bank regulators on how it mistakenly sent almost $900 million in payments to Revlon Inc.'s lenders amid a bitter a fight between the cosmetics company and creditors.
>
> The bank is in contact with watchdogs including the Office of the Comptroller of the Currency and the Federal Reserve about the situation, according to people familiar with the matter, who asked not to be identified discussing private discussions…

The roughly $900 million -- an amount equal to the full principal value of the loan, plus accrued interest -- landed in the lenders' bank accounts last week. While some opted to return the funds to Citigroup, others -- including Brigade Capital Management, Symphony Asset Management and HPS Investment Partners -- have at least initially refused to give the money back. That dispute spilled into court Monday with Citigroup suing Brigade.

Citigroup, the third-largest U.S. bank, hasn't offered a public explanation of how the "operational mistake," as its lawsuit labeled it, occurred. While errors are inevitable in an industry that moves trillions of dollars daily, the massive over-payments have captivated Wall Street and raised questions about safeguards within the firm's franchise tending to syndicated loans.

Bank regulators aren't likely to settle the fight over cash. Rather their focus will be on making certain that any lapses at the New York-based company can't be repeated and that they don't reveal deeper problems that pose a threat to its stability.

105.     On September 14, 2020, *The Wall Street Journal* published article titled,

"Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems, Sources Say,"

that reported the following:

Federal regulators are preparing to reprimand Citigroup Inc. for failing to improve its risk-management systems -- an expansive set of technology and procedures designed to detect problematic transactions, risky trades and anything else that could harm the bank.

The expected rebuke from the Office of the Comptroller of the Currency and the Federal Reserve accelerated planning for Chief Executive Michael Corbat's retirement, according to people familiar with the matter. Regulators didn't ask Mr. Corbat to step down, the people said. Rather, he came to believe that an expensive, multiyear systems overhaul designed to address regulators' concerns was best left in the hands of his successor, Jane Fraser, they said.

Citigroup on Thursday said Mr. Corbat will retire in February, surprising analysts and investors who expected him to remain in the job for a few more years.

A consent order likely will require Citigroup to develop and execute a plan to fix its risk systems, the people said. Such formal regulatory actions sometimes come with fines or stricter oversight, but it isn't clear what, if any, punishment would be imposed, they said.

* * *

Regulators have faulted Citi's management for not giving priority to the risk-management overhaul, the people said. A recent high-profile flub, Citigroup's

accidental $900 million payment to creditors of cosmetics company Revlon Inc., was seen as evidence of weaknesses in the system, the people said.

* * *

Citigroup is still operating under consent orders from 2012 and 2013 that required it to improve its anti-money-laundering processes. The OCC fined it in 2017 for failing to comply with the 2012 order.

106.    Following publication of *The Wall Street Journal* article, investors began to realize the extent of Citigroup's exposure and internal control deficiencies.  After closing at $51.00 per share on Friday, September 11, 2020, Citigroup stock dropped precipitously, reaching a low of $41.85 per share on September 23, 2020.  Citigroup stock is currently trading at approximately $43.33 per share.

B.    **The 2020 Enforcement Actions**

1.    **The 2020 OCC Action**

107.    On October 7, 2020, the OCC announced that it had assessed a $400 million civil money penalty against Citibank, related to deficiencies in enterprise-wide risk management, compliance risk management, data governance, and internal controls.  The OCC "took these actions based on the bank's unsafe or unsound banking practices for its long-standing failure to establish effective risk management and data governance programs and internal controls."  The OCC also issued a cease and desist order requiring Citibank take broad and comprehensive corrective actions to improve risk management, data governance, and internal controls. The cease and desist order imposes significant restrictions on Citigroup's business practices by requiring Citibank: "to seek the OCC's non-objection before making significant new acquisitions and reserves the OCC's authority to implement additional business restrictions or require changes in senior management and the bank's board should the bank not make timely, sufficient progress in complying with the order."

108.    In connection with the enforcement action, the OCC and Citigroup, through Citibank, entered two consent orders based on the OCC's findings.  In the first Consent Order, Citibank agreed to pay the $400 million penalty.  In the second, Citibank agreed to remedial steps designed to address its internal control deficiencies.

109.    According to the Consent Orders, the OCC found the following, which Citibank did not admit or deny:

(1)    For several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile.

(2)    The OCC has identified the following deficiencies, noncompliance with 12 C.F.R. Part 30, Appendix D, "OCC Guidelines Establishing Heightened Standards for Certain Large Insured National Banks, Insured Federal Savings Associations, and Insured Federal Branches," or unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program:

(a)    failure to establish effective front-line units and independent risk management as required by 12 C.F.R. Part 30, Appendix D;

(b)    failure to establish an effective risk governance framework as required by 12 C.F.R. Part 30, Appendix D;

(c)    failure of the Bank's enterprise-wide risk management policies, standards, and frameworks to adequately identify, measure, monitor, and control risks; and

(d)    failure of compensation and performance management programs to incentivize effective risk management.

(3)    The OCC has identified unsafe or unsound practices with respect to the Bank's internal controls, including, among other things, an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations.

(4)    The OCC has identified the following deficiencies, noncompliance with 12 C.F.R. Part 30, Appendix D, or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk data aggregation and management and regulatory reporting:

(a)     failure to establish effective front-line units, independent risk management, internal audit, and control functions as required by 12 C.F.R. Part 30, Appendix D;

(b)     inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting; and

(c)     inadequate reporting to the Board on the status of data quality and progress in remediating identified deficiencies.

(5)     In addition to the deficiencies, noncompliance with 12 C.F.R. Part 30, Appendix D, and unsafe or unsound practices detailed in paragraphs (2) – (4) above, the OCC has determined that Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the Bank. Furthermore, inadequate reporting to the Board hinders its ability to provide effective oversight.

(6)     By reason of the foregoing conduct, the Bank was in noncompliance with 12 C.F.R. Part 30, Appendix D and engaged in unsafe or unsound practices that were part of a pattern of misconduct.

(7)     The foregoing conduct also contributed to violations of law and regulation and continuous noncompliance with 12 C.F.R. Part 30, Appendix D. Among other things, the Bank's deficiencies in internal controls and compliance risk management have contributed to violations of laws and regulations and the OCC assessed civil money penalties in 2019 based specifically on violations of the Fair Housing Act, 42 U.S.C. § 3601—19, and its implementing regulation, 24 C.F.R. Part 100; violations of the holding period for other real estate owned, 12 U.S.C. § 29 and 12 C.F.R. § 34.82; and in 2020 based specifically on violations of the Flood Disaster Protection Act, as amended, 42 U.S.C. § 4012a(f), and its implementing regulations, specifically 12 C.F.R. § 22.7(a).

110.     In addition to the $400 million penalty, Citibank agreed to adopt the following remedial measures: (a) implementation of a five member Compliance Committee; (b) a comprehensive action plan to implement a functioning enterprise-wide risk management program, a compliance risk management program, improved capital planning and reporting processes, and remediate Citibank's deficient internal controls; (c) an acceptable data governance plan; and (d) enhanced board and management oversight.

111.    The Consent Orders were signed by defendants Desoer, Corbat, Costello, Hennes, Ireland, Turley, and Wright.

### 2.    The 2020 Federal Reserve Action

112.    Also on October 7, 2020, the Federal Reserve announced an enforcement action against Citigroup that requires the Company to correct "several longstanding deficiencies":

> In particular, the cease and desist order requires Citigroup to enhance its firm-wide risk management and internal controls. Among other things, the firm has not taken prompt and effective actions to correct practices previously identified by the [Federal Reserve] in the areas of compliance risk management, data quality management, and internal controls.

113.    As alleged herein, Citigroup is required to maintain an enterprise-wide risk management program designed to identify and manage risks across the consolidated organization. The Cease and Desist Order states that the most recent supervisory assessment of Citigroup issued by the Federal Reserve identified "significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management."

114.    In particular:

> Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve, including in the areas described… above and those addressed in (i) the Consent Order issued by the Board of Governors on March 21, 2013 to remediate outstanding deficiencies in Citigroup's anti-money laundering compliance program and (ii) the Consent Order issued by the Board of Governors on May 20, 2015 to remediate outstanding deficiencies in Citigroup's compliance and control infrastructure relating to its foreign exchange program and designated market activities.

115.    In response to the Federal Reserve's findings, the Board of Citigroup met and adopted a resolution authorizing entrance into the Consent Order, and consenting to compliance

with each and every provision of the Consent Order, and waiving any and all rights that the Company might have pursuant to section 8 of the Federal Deposit Insurance Act.

116.    The Board further agreed to submit a written plan acceptable to the Director of the Federal Reserve's Division of Supervision and Regulation that describes the actions it will take to execute its oversight of the deficiencies identified in the Consent Order, specifically including the following four items: (a) actions that the board of directors will take to hold senior management accountable for executing effective and sustainable remediation plans by committed deadlines; (b) actions the board of directors will take to ensure senior management improves, and thereafter maintains, effective and independent enterprise-wide risk management, and that internal audit findings are effectively remediated; (c) actions that the board of directors will take to ensure that senior management incentive compensation is consistent with risk management objectives and measurement standards; and (d) actions that the board of directors will take to ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in the Consent Order.

117.    The Consent Order additionally requires Citigroup to take steps to remediate deficiencies in its risk management and internal controls, data quality management, and compliance risk management.  The Company's compliance with the consent order will be assessed based on required quarterly progress reports.

118.    On October 13, 2020, the Company conducted its third quarter 2020 earnings call. During the call, defendant Corbat acknowledged that Citigroup "need[s] to modernize our infrastructure, governance and processes. We've had remediation programs in place and while we've been making progress in these areas, we're simply not where we need to be."  Also during

the call, the Company's Chief Financial Officer acknowledged that the $400 million penalty would negatively impact earnings per share by $0.19.

## VII.   DAMAGES TO THE COMPANY

119.    As a direct and proximate result of the Individual Defendants' conduct, Citigroup has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.    The over $2.6 billion paid to settle regulatory and government actions due to the Company's pervasively deficient internal controls;

b.    Costs incurred investigating, responding to, and defending the Company and the Individual Defendants in the regulatory and government actions; and

c.    Funds expended to compensate Individual Defendants while they were breaching their fiduciary duties.

120.    In addition, Citigroup's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

121.    The actions complained of herein have irreparably damaged Citigroup's corporate image and goodwill.  For at least the foreseeable future, Citigroup will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Citigroup's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

122.    Plaintiff brings this action derivatively in the right and for the benefit of Citigroup to redress injuries suffered, and to be suffered, by Citigroup as a direct result of  the Individual Defendants' breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the

Exchange Act. Citigroup is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

123. Plaintiff will adequately and fairly represent the interests of Citigroup in enforcing and prosecuting its rights.

124. Plaintiff has continuously been a shareholder of Citigroup at times relevant to the wrongdoing complained of and is a current Citigroup shareholder.

125. When this action was filed, Citigroup's Board of Directors consisted of seventeen directors: defendants Corbat, Costello, Dailey, Desoer, Dugan, Fraser, Hennes, Henry, Ireland, Jacobs, James, Reiner, Taylor, Turley, Wright, Wynaendts, and Zedillo. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**B.      Demand Is Excused Because the Director Defendants' Conduct Did Not Constitute a Valid Exercise of Business Judgment**

126. Plaintiff did not make a demand on the Board prior to instituting this action because the wrongdoing alleged herein evidences a pattern of conduct showing a wholesale abandonment of the Individual Defendants' fiduciary duties. The Individual Defendants, over a period of years, despite repeatedly entering consent orders, guilty pleas, and other regulatory settlements, failed to ensure that Citigroup's internal controls were adequate.

127. These acts, and the other improper acts set forth herein, which demonstrate a pattern of misconduct, were not the product of a valid or good faith exercise of business judgment, nor could they have been.

128. The Individual Defendants' misconduct at the heart of this case constitutes the direct facilitation of violations of federal law, including knowingly and consciously presiding over the Company's systematic deficiencies and unsound practices in Citigroup's risk management and

oversight of operations.   Among other things, the Individual Defendants caused or allowed Citigroup to operate with several deficient internal controls despite being on actual notice that the internal controls were deficient and that remediation was required.

129.   The Individual Defendants' blatant and repeated disregard of their responsibility to safeguard the Company against wrongdoing indicate they knowingly adopted, endorsed, or condoned a business strategy that operated in violation of applicable regulations and laws, which cannot be considered a legitimate exercise of business judgment. Demand is therefore excused.

### C.   Defendants Corbat, Fraser, and Desoer are Not Disinterested

130.   At all relevant times, Corbat was the Company's CEO, and therefore was not independent under NYSE listing rules or Citigroup's own independence guidelines.   As an employee, Corbat derives substantially all of his income from his employment with Citigroup, and thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.   As a result, Corbat would be interested in a demand regarding his own wrongdoing or the wrongdoing of his fellow directors, and demand is futile as to him.

131.   Fraser been employed by Citigroup since 2004 and the Company recently announced that she will be replacing Corbat as CEO in 2021.   Fraser is not independent under NYSE listing rules or Citigroup's own independence guidelines.   As an employee, Fraser derives substantially all of her income from her employment with Citigroup, and thus could not disinterestedly consider a demand for action that might require her to sue the directors that control her continued employment and her elevation to CEO in 2021.   For Fraser, elevation to the position of CEO will be her most significant career achievement, she would be Citigroup's first female

CEO, and the promotion will entitle her to compensation far in excess of the compensation she earns in her current position. As a result, Fraser would be interested in a demand regarding her own wrongdoing or the wrongdoing of her fellow directors, and demand is futile as to her.

132.   Desoer served as an executive of Citibank since 2013, and its CEO from 2014 until 2019. As a result, Desoer personally presided over substantially all of the wrongdoing identified in the OCC consent orders, has derived her primary source of income for six of the last seven years from her employment by Citibank, and thus Citigroup. Desoer could not disinterestedly consider a demand to investigate wrongdoing at Citibank that she personally presided over, and she could not disinterestedly investigate the wrongdoing of her fellow directors for the same reason. Demand is excused as to Desoer.

### D.   Defendants Corbat, Hennes, Henry, Reiner, Taylor, Turley, and Zedillo

133.   Defendants Corbat, Hennes, Henry, Reiner, Taylor, Turley, and Zedillo have each served on Citigroup's Board since 2015 or earlier. As a result, these directors personally approved Company's entrance into the 2013, 2014, and 2015 consent orders and the DOJ guilty plea. They agreed to settle the regulatory actions against the Company by promising to institute specific internal controls on a fixed schedule, and they agreed to conduct continuing supervision of the Company's internal controls and to submit regular reports to regulatory authorities. Notwithstanding their actual knowledge of the terms of these agreements and their obligations under them, they failed to discharge their fiduciary duties by implementing functioning internal controls. Moreover, due to their ongoing reporting obligations, defendants Corbat, Hennes, Henry, Reiner, Taylor, Turley, and Zedillo actually knew that they were not implementing adequate internal controls. Due to their fiduciary breaches, the Company has incurred billions of dollars of

regulatory penalties.  Defendants Corbat, Hennes, Henry, Reiner, Taylor, Turley, and Zedillo face a substantial likelihood of liability as a result and demand is excused as to them.

       **E.**      **Defendants Costello, Desoer, Hennes, Ireland, Turley, Wright, and Zedillo**

134.     Defendants Costello, Desoer, Hennes, Ireland, Turley, Wright, and Zedillo have each served on Citibank's board of directors during the wrongdoing alleged above.  As a result, these directors personally approved Citibank's entrance into consent alleged herein and were on actual notice of their obligations under the consent orders.  They agreed to settle the regulatory actions against Citibank by promising to instituted specific internal controls on a fixed schedule, and they agreed to conduct continuing supervision of Citibank's internal controls and to submit regular reports to regulatory authorities.  Notwithstanding their actual knowledge of the terms of these agreements and their obligations under them, they failed to discharge their fiduciary duties by implementing functioning internal controls.  Moreover, due to their ongoing reporting obligations, Defendants Costello, Desoer, Hennes, Ireland, Turley, Wright, and Zedillo actually knew that they were not implementing adequate internal controls.  Due to their fiduciary breaches, the Company has incurred billions of dollars of regulatory penalties.  Defendants Costello, Desoer, Hennes, Ireland, Turley, Wright, and Zedillo face a substantial likelihood of liability as a result and demand is excused as to them.

       **F.**      **Defendants Costello, Dailey, Dugan, Desoer, Hennes, James, Turley, Wynaendts, and Zedillo**

135.     Defendants Costello, Dailey, Dugan, Desoer, Hennes, James, Turley, Wynaendts, and Zedillo are members of the Risk Management Committee.  Under the charter of the Risk Management Committee, these directors were charged with oversight of overall risk management.  These defendants wholly failed to adequately oversee Citigroup's regulatory risks, exposing it billions of dollars in regulatory penalties.  Their knowing failure to cause Citigroup to abide by

regulatory consent agreements could not have been a good faith exercise of business judgment and has severely harmed the Company.   As a result, defendants Costello, Dailey, Dugan, Desoer, Hennes, James, Turley, Wynaendts, and Zedillo face a substantial likelihood of liability and demand is excused as to them.

**IX.    COUNT I – Against All Defendants for Breach of Fiduciary Duty**

136.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.     Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Citigroup's business and affairs, particularly with respect to issues as fundamental as federally mandated internal controls and compliance with federal laws and regulations.

138.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Citigroup.

139.     In breach of their fiduciary duties owed to Citigroup, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

140.     In particular, the Individual Defendants knowingly or recklessly concealed Citigroup's inadequate internal controls and represented to investors that they had instituted a rigorous system of risk management, and legal regulatory compliance.

141.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Citigroup has sustained and continues to sustain significant damages.

Including direct monetary damages, restrictions on its business practices, and reputational harm. As a result of the misconduct alleged herein, defendants are liable to the Company.

## X.     COUNT II – Against All Defendants for Unjust Enrichment

142.    Plaintiff incorporates by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

143.    During their wrongdoing alleged herein, defendants received bonuses, stock options, stock, or similar compensation from Citigroup that was tied to the Company's financial performance, or otherwise received compensation that was unjust in light of defendants' bad faith conduct, violation of the Company's code of ethics, and self-dealing.

144.    Plaintiff, as a shareholder and representative of Citigroup, seeks restitution from the Individual Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

## XI.    COUNT III – Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9

145.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth in this paragraph, except to the extent those allegations plead knowing or reckless conduct by the Individual Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

146.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral,

containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

147.   The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2019 and 2020 Proxy Statements.  The 2019 and 2020 Proxy Statement contained proposals to Citigroup's stockholders urging them to re-elect the members of the Board, approve a new incentive compensation plan, and then approve an amendment to the new incentive compensation plan.

148.   The Proxy Statements, however, misstated or failed to disclose deficiencies in Citigroup's internal and disclosure controls that were known to the Board when the Proxy Statements were filed.  By reasons of the conduct alleged in this Complaint, the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Citigroup misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Citigroup's recommendation to re-elect the current Board, approve certain executive compensation, and amend the Company's equity compensation plan.

149.   The misleading information contained in the 2019 and 2020 Proxy Statements was material to Citigroup's stockholders in determining whether or not to elect the Individual Defendants, approve the new incentive compensation plan, and amend the incentive compensation plan.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the Proxy Statements was

an essential link in (i) the reelection of nominees to the Board, (ii) and the approval of the executive compensation plan.

150.    Plaintiff, on behalf of Citigroup, thereby seeks relief for damages inflicted upon the Company based on the misleading 2019 and 2020 Proxy Statements in connection with the improper re-election of the members of the Board and approval of the 2019 Incentive Compensation Plan and the 2020 amendment to the 2019 Incentive Compensation Plan.

## XII.    PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Citigroup, demands judgment as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Citigroup and that plaintiff is an adequate representative of the Company;

B.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.    Declaring that defendants have breached and/or aided and abetted the breach of their fiduciary duties to Citigroup;

D.    Directing Citigroup to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Citigroup and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to strengthen the Company's controls over financial reporting;

2.        a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.        a proposal to strengthen Citigroup's oversight of its disclosure procedures;

4.        a provision to control insider transactions; and

5.        a provision to permit the stockholders of Citigroup to nominate at least three candidates for election to the Board;

E.        Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Citigroup has an effective remedy;

F.        Awarding to Citigroup restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.        Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.        Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: October 16, 2020            By: /s/ *Benjamin I. Sachs-Michaels*

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
Matthew M. Houston
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

**LAW OFFICE OF ALFRED G. YATES, JR. PC**
Alfred G. Yates, Jr.
Gerald L. Rutledge
300 Mt. Lebanon Blvd, Suite 206-B
Pittsburgh, PA 15219
Tel: (412) 391-5164

*Counsel for Plaintiff Dean Andersen*

## **CITIGROUP INC. VERIFICATION**

I, Dean Andersen, hereby verify that I am familiar with the allegations in the Verified Stockholder Derivative Complaint (the "Complaint"), and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 10/16/2020 _____

DocuSigned by:

63E2BB94C6A043C...

Dean Andersen